IN THE UNITED STATES COURT FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

2021 AUG 26  A 11: 58

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

JOSH TOLAR, RUSTY TAYLOR,                    )
GARY DILLARD, LOUIS EDMONDSON,               )
CHARLES MCGRIFF,                             )
REUBEN WOMACK, individually and              )
D/B/A  RJ FARMS, JOHN BOWEN,                 )
GERALDINE BOWEN, EVERETT TOLAR,              )
MANLEY TOLAR, BENJAMIN COTY                  )       CASE NO.
TAYLOR, TONY TAYLOR, HOLLY                   )       1:21- cv-568
TAYLOR, A.B. CAROLL, TRACY                   )
CARROLL, ASHLEY INGRAM, DAWN                 )
INGRAM, SARA INGRAM, KENT                    )
INGRAM, VICTORIA INGRAM,                     )
TROY ADAMS, individually and D/B/A           )
4G HAY FARMS, LISA PETERSON,                 )
TIM HARPER, CEDRIC HARPER,                   )
MAXINE HARPER, VIA HARPER,                   )
JUSTIN CARROLL, JOHN MCDANIEL,               )
SHEILA MCDANIEL, LOGAN MCDANIEL,             )
JORDAN MCDANIEL, JOHNNIE                     )
WOMACK, CHRIS LOVE, DANIEL LOVE,             )
and JAMES LOVE.                              )
                                             )
        PLAINTIFFS,                          )
                                             )
v.                                           )
                                             )
UNITED STATES OF AMERICA,                    )
FARM SERVICE AGENCY,                         )
UNITED STATES DEPARTMENT OF                  )
AGRICLUTURE,                                 )
                                             )
        DEFENDANTS.                          )

1

# COMPLAINT

## STATEMENT OF THE PARTIES

1.    Josh Tolar is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

2.    Rusty Taylor is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

3.    Gary Dillard is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

4.    Louis Edmondson is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

5.    Charles McGriff is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of

this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

6.     Reuben Womack, d/b/a RJ Farms, is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

7.     John Bowen is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

8.     Geraldine Bowen is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

9.     Everett Tolar is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

10.     Manley Tolar is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this

complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

11.    Benjamin Coty Taylor is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

12.    Tony Taylor is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

13.    Holly Taylor is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

14.    A.B. Carroll is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

15.    Tracy Carroll is a resident citizen of Henry County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this

4

complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

16.     Ashley Ingram is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

17.     Dawn Ingram is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

18.     Sara Ingram is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

19.     Kent Ingram is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

20.     Victoria Ingram is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of

this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

21.    Troy Adams is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division and at times material hereto was d/b/a as 4G Hay Farms.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

22.    Lisa Peterson is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

23.    Tim Harper is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

24.    Cedric Harper is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

25.    Maxine Harper is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division.  Those things made the basis of this

complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

26.    Via Harper is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

27.    Justin Carroll is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

28.    John McDaniel is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

29.    Sheila McDaniel is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

30.    Logan McDaniel is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of

this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

31.     Jordan McDaniel is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

32.     Johnnie Womack is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

33.     Chris Love is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

34.     Daniel Love is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

35.     James Love is a resident citizen of Houston County, Alabama situated in the Middle District of Alabama, Southern Division. Those things made the basis of this

8

complaint arise from activities occurring within the Middle District of Alabama, Southern Division.

36.    Your Petitioners, file this petition for administrative review and hearing de novo against the Farm Service Agency, United States Department of Agriculture ("Agency"), the United States Secretary of Agriculture George Irvin "Sonny" Perdue, III, pursuant to Title 5 U.S.C. §706; 7 U.S.C. §§ 6998, 7996; 7 C.F.R. §§ 718.2, 11.13, 1437, 11.9(e), 706; on the final Agency Action, Determination and Review.

37.    The Petition arises from the denial of claim benefits under the Noninsured Crop Disaster Assistance Program ("NAP") under the provisions of the Federal Agriculture Improvement and Reform Act of 1966. (7 U.S.C. § 7333).

38.    Your Petitioners seek relief from the Appeal Determination and final Agency Action, and denial by the Director, USDA National Appeals Division, Secretary of Agriculture, on their respective crops, and NAD case numbers hereinafter identified as to each Petitioner.

39.    Your Petitioners have exhausted all administrative remedies, including County Committee, State Committee, USDA National Appeals Division, Secretary of Agriculture and Director of Review; and this Petition seeks to appeal those final Agency Actions de novo, and be granted equitable relief.

40.    The Respondent Farm Service Agency ("FSA") is an authority or Agency of the Respondent, United States Department of Agriculture. (Agency)

41.    The records of the Agency Actions, as well as various statutes and regulations are attached and specifically incorporated herein by reference.

## JURISDICTION AND VENUE

42.    This Court has jurisdiction pursuant to 5 U.S.C. § 706; 7 U.S.C. § 1508(b)(c)(h); 7 U.S.C. §§6998, 7333, 7996; 7 C.F.R. §§ 1437, 11, 718.2, 1437.16; 28 U.S.C. §§ 1331, 1391, 1346(a), 1402(a), 2341, 2343; 28 C.F.R. Part 14.

43.    Venue is proper in the United States District Court for the Middle District of Alabama, Southern Division, because your Petitioners, are United States Citizens over the age of 21 years, who reside in Counties within the Middle District of Alabama. In addition, the administration of farm activities for all Petitioners occurred in Counties located in the Middle District of Alabama, and the actions complained herein occurred in Counties within the Middle District of Alabama. (28 U.S.C. §2343).

## BACKGROUND FACTS

44.    Each of your Petitioners' principal business is agriculture, and in most cases has been the family's principal business for generations. Your Petitioners have farmed both row crops (Area Risk Protection Insurance, ARPI) and specialty crops (NAP insurance) to include crops such as green bell peppers, watermelons, squash and turnips.

45.    In 2017 your Petitioners controlled the farming operations for their respective farms where they planted various crops which included, as hereinafter more particularly identified, green bell peppers, watermelons, squash and turnips, etc.; and all were considered the producers of their respective farming crops. (Pursuant to CFR 718.2 Definitions)

46.    As the operators of their respective farming operations, Petitioners expended labor, provided farm land, remained responsible for expenses, and thus, shared in the risk of producing their crops, which entitled them to share in any profits of the crop or expected crop.

47.    Before engaging in growing their respective crops in the crop year 2017, Petitioners, following good farm practices, each purchased a NAP policy by filing an application form CCC-471 and purchasing NAP coverage insurance against crop losses due to disaster because of damaging weather, such as drought, excessive moisture, freeze, etc.; adverse natural occurrences, such as earthquake or flood; and conditions related to damaging weather or adverse natural occurrences, such as excessive heat, disease or insect, any of which may occur during the coverage period on their respective crops.

48.    In good faith reliance on the agents of the FSA, the language of the NAP program as well as its purposes and protections, and the availability of an issued NAP policy to protect their investments, Petitioners charged farm supplies, paid laborers, and expended their individual efforts in working their crops in an effort to grow and market their crops.

49.    Petitioners expended time, money and labor with an expectation of commercially growing their respective crops, and reasonably expected their production to meet  or exceed the yield per acre necessary to make the crop profitable and placed reliance on the NAP policy in the event of the covered perils.

50.    NAP coverage requires the Farm Service Agency (FSA) to work with the producer to complete the necessary forms, assist the Producer to understand the coverage, to ensure compliance with the program and to obtain adequate information in order to provide NAP benefits.

51.    The purpose of NAP is to help manage and reduce the risks to producers growing certain crops when defined disasters produce a loss or damage to the crop.

52.    Annually, most, if not all, Petitioners finance the next year's crops through local banks, often assigning crops, production, insurance, and disaster payments as collateral in order to buy seed, fertilizer, herbicides, insecticides, costs of labor, equipment and irrigation, among other costs necessary to produce, harvest and sell crops.

53.    Petitioners are eligible producers as defined under NAP as they were operators of their respective farms and shared in the risk of producing their crops by their time, labor, use of their land, management, and investment, and each was therefore entitled to share in the crop or expected crop. (7 C.F.R. § 718.2).

54.    Each of the Petitioners timely purchased NAP coverage for their respective crops as the producer of those crops.

12

55.     After applying for NAP coverage, Petitioners planted their crops and performed those acts necessary to the production of their crop, but each of the Petitioners suffered a disaster loss and filed notice of loss and application for payment to the Agency.

56.     This Petition for Review arose as a result of the wholesale denial of eligibility for benefits under the 2017 crop year NAP claims filed by the Petitioners based on the arbitrary and unreasonable conclusions as hereinafter more particularly identified as to each claim.

57.     USDA failed to timely and properly adjudicate and pay Plaintiffs' NAP claims as their claims are still unpaid as of the filing of this lawsuit.

58.     USDA's arbitrary, capricious, wrongful actions and/or inaction— to wit, failing to timely and properly adjudicate and pay Petitioners' NAP claims— directly and/or proximately caused the damages suffered by Petitioners. As a further direct and/or proximate result of USDA's arbitrary, capricious, wrongful actions and/or inaction, Plaintiffs have suffered, and will continue to suffer, damages including, without limitation: (i) loss of revenue;    (i) the value of their time seeking adjudication and payment of their NAP claims; (iii) inability to fully conduct their ongoing farming operations and future farming operations.

59.     The Agency is bound to treat similarly situated plaintiffs consistently. Here, the Agency has intentionally treated your Petitioners differently from others similarly situated and there is no rational basis for the disparity in treatment.

13

60.    The rights of each Petitioner were violated in a virtually identical manner as a result of the USDA's arbitrary, capricious, willful, reckless, and/or negligent actions and/or inaction.

## COMMON ISSUES

### I

### Good Farming Practices

61.    The Agency's wrongful denial of NAP payments based in whole or in part upon the assertion that the producer failed to exercise "good farming practices" due to the existence of weeds observed on inspections following extended periods of rain which prevented access to fields and/or after the producer had filed a claim and abandoned a failed crop.

62.    The regulations define "good farming practices" as follows:

a. The production methods utilized to produce the insured crop and allow it to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance, which are: (1) For conventional or sustainable farming practices, those generally recognized by agricultural experts for the area ... [The AIP] may, or [the insured] may request [the AIP] to, contact FCIC to determine whether or not production methods will be considered to be "good farming practices." 7 C.F.R. § 457.8.

63.    Neither the inability to perform weed control due to excessive moisture nor the failure to continue weed control after the determination of a failed crop is indicative of a failure to observe good farming practices.

II.

## Insufficient Submittal of Information

## Relating to Harvest and Marketing Plans

64.    Denial of the NAP claim based upon an Agency determination that the individual is not a "producer" due to the failure to present, as a part of the claim, information relating to the farmer's harvest and marketing plans for the crop planted and insured although such absence has no causal connection to the loss sustained.  These determinations were made, and farmer's claims denied despite the NAD's Director having held that an absence of a harvesting and marketing plan that has no causal connection to the crop loss cannot be a basis for denying a producer NAP benefits.  *See NAD Case No. 2018S000118 (Dir. Rev. June 12, 2019)*.  The Agency's regulations define a "producer" as an owner, operator, landlord, tenant, or sharecropper, who shares in the risk of producing a crop and who is entitled to share in the crop available for marketing from the farm or would have shared had the crop been produced. *See* 7 C.F.R. § 718.2.

III.

## Unjustified Total Reliance Upon PRISM for Determination of Rainfall

65.    The PRISM model is based upon the development of spatial data sets in 1.3 km grids of thirty (30) year mean monthly precipitation and are the official spatial data sets of the United States Department of Agriculture.  In other words, the PRISM data sets are based upon "averages" using a limited number of surface stations which the Agency and Administrative Judges relied upon to the exclusion of eyewitness and offered expert meteorological testimony.  Further, because it is based on averages, PRISM does not take into account what are best described as "fence row" rainfalls; that is a rainfall which abruptly stops at the fence row of a field.  Still further, reference to and reliance solely on PRISM alone does not take into account the devastating effect on seed and/or plants caused when they are silted over during brief but heavy rainfall events.

## IV

## Insufficient Production Records

66.    The FSA failed to undertake the procedure specified by its Handbook in comparing production with the production reported by neighboring producers with acceptable records before denying application for payment based on insufficient production records. Specifically, the regulations require producers to provide "verifiable" or "reliable" records acceptable to the Agency of any crop harvested. *7 C.F.R. § 1437.8.* Verifiable records are defined as contemporaneous records that list the date, disposition, quantity, and a price that the Agency can verify through an independent

16

source. *Agency Handbook 1-NAP (Rev. 2) ¶601C.* If the producer cannot provide verifiable records, the producer may provide anything available such as receipts, ledgers, deposit slips, cash register tapes, invoices for harvesting, or u-pick records. *Agency Handbook 1-NAP (Rev. 2) ¶ 601D.* If records do not exist for all or part of the producer's production, the producer must nevertheless report or account for the production. *Agency Handbook 1-NAP (Rev. 2) ¶ 601A.* If verifiable records support the producer's certification, the Agency is bound to accept the producer's records and certification. *Agency Handbook 1-NAP (Rev. 2) ¶ 601E.* One means of determining production is to compare the producer's record of production with neighboring producers of the same or similar crop with acceptable production records. *Agency Handbook 1-NAP (Rev. 2) ¶ 601E.* If comparable producers experienced similar levels of production, the Agency is to consider the producer's certification, supported by some non-verifiable record of production, acceptable. *Agency Handbook 1-NAP (Rev. 2) ¶ 601D.* If comparable producers did not experience similar levels of production, the Agency may disapprove the application for payment. *Agency Handbook 1-NAP (Rev. 2) ¶ 601D.*

67.    The Agency failed and refused to compare production records with neighboring producers of the same or similar crop with acceptable production records, arguing that it is not required to make the comparison in the absence of contemporaneous records of production. However, The National Appeals Division Director rejected the Agency's argument in another action. *NAD Case No. 2017E000191 (Dir. Rev. Feb. 27, 2018).* In that case, the Director reasoned that, when the Agency's Handbook provides

an explicit procedure for determining a producer's production in acting on an application

for payment, the Agency must follow that procedure. *Id.*

**Count 1**
(Josh Tolar)

68.    Petitioner Josh Tolar incorporates the foregoing paragraphs one through

fifty-nine (1-59), as if set herein verbatim.

69.    Mr. Tolar is a third-generation fruit and vegetable farmer. He and his

family have, over the years, developed several buyers for their produce including grocery

stores and two brokers representing two major distribution centers. They also sell their

produce at farmers' markets.

70.    On May 3, 2017, Mr. Tolar planted 38.07 acres of squash in five separate

fields. Mr. Tolar's expected or Farm Service Agency (FSA) approved yield for the

squash was 7,800 pounds per acre.

71.    During the growing season Mr. Tolar's crop experienced dry weather

followed by a period of excess rainfall that caused losses to the crop. Mr. Tolar reported

that due to the damaging weather, he was able to harvest only 10 boxes of squash that

weighed 30 pounds per box, or a total of 300 pounds. He further reported that he sold the

10 boxes to his wife for $15 a box, and she then sold the boxes for the same price at a

local farmer market to unidentified individuals.

72.    On June 16, 2017, Mr. Tolar provided FSA a notice of loss reporting that

drought had caused losses to his crop beginning May 25, 2017. On June 22, 2017, Mr.

18

Tolar provided FSA a second notice of loss reporting that his crop had suffered losses due to excess moisture beginning June 19, 2017.

73.    On July 17, 2017, an FSA loss adjuster inspected Mr. Tolar's crop acreage and appraised the squash production that remained in Mr. Tolar's fields. The loss adjuster determined that the appraised production on 38.07 acres of squash was 59,967 pounds.

74.    On October 24, 2017, FSA's Deputy Administrator for Farm Programs disapproved Mr. Tolar's notice of loss because he did not have a sufficient plan for harvesting his crop and had failed to harvest the production in his fields, asserting the same as an ineligible cause of loss for NAP purposes. On October 26, 2017, Mr. Tolar visited the local FSA office and disputed FSA's disapproval of his notice of loss. On the same date, Mr. Tolar filed an application for NAP payment. He certified in his application that he had produced 60,267 pounds of squash, which included 300 pounds of harvested production and 59,967 pounds of appraised production.

75.    On November 15, 2017, FSA's Deputy Administrator denied Mr. Tolar's application for payment because Mr. Tolar failed to provide verifiable or reliable records of his production. FSA did not compare Mr. Tolar's production to that of neighboring producers before it issued its decision on his application for payment.

### Count 2
(Rusty Taylor)

76.    Petitioner Rusty Taylor incorporates the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

**Bell Pepper Crop**

77.     In 2017, Mr. Taylor planted 32 acres of bell pepper plants from transplants on one of his farms on March 30, 2017. He planted an additional 18.98 acres of bell pepper transplants on April 10, 2017, and April 11, 2017, on his other farm. Mr. Taylor purchased the transplants and subleased the farmland from his father.

78.     Mr. Taylor registered 32 acres of bell pepper transplants with the Agency under Farm Serial Number (FSN) 1267, and 18.98 acres under FSN 1302.

79.     Mr. Taylor harvested a bell pepper crop on June 24, 2017, and he did not harvest any bell peppers after that date.

80.     On August 7, 2017, Mr. Taylor filed form CCC-576, "Notice of Loss," reporting that excess moisture/precipitation that started on April 16, 2017, caused his bell pepper crop loss. Mr. Taylor reported that his loss was apparent to him the same day that he filed his Notice of Loss.

81.     On August 19, 2017, the LA completed a loss inspection of FSN 1267, Tract 1693, Field 1A and FSN 1302, Tract 1830, Fields 1 and 2. The LA reported that he did not see any marketable production. The LA reported that the field with the largest and greatest number of bell pepper plants, FSN 1302, Track 1830, Field 1, had the most fruit of any field, but the bell peppers were small, discolored and/or dried. The LA took photos of fields with various weeds, grasses and sedges that greatly outnumbered and towered over the bell pepper plants. The LA reported that Mr. Taylor's plant spacing was

consistent among the fields, which was 6-foot rows with plants spaced from 16 to 18 inches apart.

82.     On November 15, 2017, the Agency determined that Mr. Taylor was not eligible for a 2017 NAP payment for his crop loss because his loss was due to inadequate weed control measures and plant spacing.  The Agency determined that Mr. Taylor completed his harvest on June 29, 2017, but he did not report his loss until August 7, 2017.  The Agency also determined that Mr. Taylor's production documentation was unacceptable for NAP payment purposes because his check/receipt was not verifiable or reliable.

83.     On December 11, 2017, Mr. Taylor filed an unsuccessful NAD appeal. (NAD Case No. 2018S000139, NAD File 1, Tab 2)

### Cantaloupe Crop

84.     Mr. Taylor sub-leases farmland from his father.

85.     On February 2, 2017, Mr. Taylor purchased NAP coverage for cantaloupe and other crops.

86.     On March 30, 2017, Mr. Taylor planted 2.9 acres of transplants to produce cantaloupe on his farm.

87.     The crop inputs that Mr. Taylor used for FSN 1298, Tract 1807, including the transplants, fertilizer, and herbicides, were sold to Mr. Taylor's father or purchased through Mr. Taylor's father's accounts with vendors. Mr. Taylor owes his father for some of the crop inputs.

88.    Mr. Taylor harvested his cantaloupe crop on June 6, 2017, and June 9, 2017. He did not harvest any cantaloupe after June 9, 2017.

89.    Between June 19, 2017, and June 26, 2017, Mr. Taylor's county experienced five days of rain.

90.    On June 26, 2017, Mr. Taylor filed form CCC-576, "Notice of Loss," reporting that excess moisture/precipitation that started on June 19, 2017, caused his cantaloupe crop loss. Mr. Taylor reported that his loss was not apparent to him until the same day that he filed his Notice of Loss.

91.    On July 7, 2017, the Agency's loss adjuster, or LA, inspected FSN 1298, Tract 1807, Field 3A. The LA took photos and reported on form FSA-501, Statement of Facts, that the field had some weeds; vines were dead; and most of the cantaloupe left in the field were rotten. The LA reported that Mr. Taylor informed him that some of the cantaloupe had been harvested but most rotted or were unmarketable. The LA reported that Mr. Taylor informed him that excessive moisture caused the vines to die and melons to rot. The LA indicated in his report that he was unable to determine the cause of loss or perform an accurate appraisal.

92.    On November 15, 2017, the Agency determined that Mr. Taylor was not eligible for a 2017 NAP payment for his claimed loss. The Agency determined that (1) the disaster weather event that Mr. Taylor reported as causing his loss, excess moisture/precipitation beginning June 19, 2017, was after his reported harvest dates of June 6, 2017, and June 9, 2017, and the weather did not cause Mr. Taylor's loss; (2) Mr.

Taylor did not meet the definition of a producer; and (3) Mr. Taylor's production documentation was not acceptable for NAP payment purposes because his receipt was not dated and did not show both the quantity and price of the crop sold.

### Count 3
(Gary Dillard)

93.    Petitioner Gary Dillard incorporates foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

94.    Mr. Dillard entered into a partnership agreement with his brother. On March 30, 2017, the Partnership purchased turnip seed and herbicide for crops of turnip greens. The herbicide was applied to Farms 2868 and 6669 prior to planting turnips on those farms. Then, on March 31, 2017, a crop of turnips was planted using the Partnership's turnip seed on 94.88 acres on Farms 2868 and 6669 (50.23 acres on Farm 2868, and 44.65 acres on Farm 6669). All the production costs for the 94.88 acres of turnips were billed to the Partnership, and the Partnership paid all the production costs for the crop. Although, the Partnership paid the production costs for the turnips on the subject farms, Mr. Dillard erroneously reported in a crop acreage report that he, rather than the Partnership, had a 100 percent share in the turnip crop on those farms. The Partnership also planted turnips on other acreage, and in crop reports for that acreage, the Partnership reported that it had a 100 percent share of the turnip crop.

95.    On April 7, 2017, Mr. Dillard's brother, acting on behalf of the Partnership, filed a notice of loss reporting that excess moisture/precipitation had caused losses to the turnip greens on Farms 2868 and 6669 beginning April 3, 2017.

*96.*    During his inspection on April 15, 2017, the loss adjuster photographed the crop acreage. His photographs show that there were deep rain-washed gullies across the acreage, and the rows where the turnips had been planted were damaged by gullies and/or covered with silt.

97.    On May 10, 2017, and as late as August 9, 2017, loss adjusters made additional inspections of Farms 2868 and 6669 but found that no turnips had germinated from the rows that had been silted over by the rainfall on April 5, 2017. During these visits, they also noted weeds on the crop acreage.

98.    On September 28, 2017, Mr. Dillard provided FSA a document describing the farming practices and activities that had been employed to produce the crop of turnip greens.

99.    On January 30, 2018, Mr. Dillard's brother filed a NAP application for payment on behalf of the Partnership for turnip greens on Farms 2868 and 6669.

100.    On February 27, 2018, FSA denied Mr. Dillard's notice of loss and application for payment because: (1) the rainfall occurring between April 3, 2017, and April 7, 2017, would not have been sufficient to cause the claimed losses, (2) fertilizer was not applied to the crop, (3) inspections from April 15, 2017, through August 9, 2017, reveal heavy weed pressure and no turnips, and (4) Mr. Dillard did not present sufficient information about his plans for harvesting and marketing the crop to enable FSA to determine an intent to harvest and to determine his legitimate and actual risk in growing the crop.

**Count 4**
(Louis Edmondson)

101.    Petitioner Louis Edmondson incorporates foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

102.    In 2016 and 2017, Mr. Edmondson farmed summer squash on farmland leased from several farmers in Houston County, Alabama. He registered his leased farmland with the Agency.

103.    In preparation for planting summer squash in 2017, Mr. Edmondson purchased seeds, herbicides, and fertilizer.

104.    On February 21, 2017, Mr. Edmondson purchased NAP coverage for his summer squash crop.

105.    On May 10, 2017, and May 17, 2017, Edmondson planted 79.99 acres of summer squash on Farm Serial Numbers (FSN) 1866, 2352, 5348, 5421, and 5659. Mr. Edmondson plowed his fields for weeds and sprayed an herbicide after planting his summer squash.

106.    On June 6, 2017, the Agency's loss adjuster (LA) conducted a growing season inspection of FSN 2352, Tract 3295. The LA took photos and reported that he saw fields with "poor stands of squash plants, small in size, no plants blooming, no small squash observed on plants, and displayed signs of discoloration." FSN 2352, Tract 3295 had nutgrass, broadleaf weeds, and other grasses growing throughout the fields.

107.    On June 13, 2017, the LA conducted a growing season inspection of FSN 1866, Track 2624, Field 4. The LA took photos and reported that the field had a good stand, but the plants showed a lack of fertilization.

108.    On June 15, 2017, the LA conducted a growing season inspection, took photos, and reported.  The LA reported that FSN 2352, Fields 5 and 3A, were grassy but had a good stand, and the plants were rather small; FSN 2352, Fields 2A and 4A, were grassy and the plants were very small; FSN 2352, Field 1A, was very clean with very healthy plants; FSN 5659, Field 5, was very clean and the plants were in good condition; FSN 5348 was in fair condition and fairly clean; FSN 5421, Field 1, was in good condition and fairly clean.

109.    On June 16, 2017, Mr. Edmondson harvested all of the marketable squash by hand.

110.    Excess moisture/precipitation affected Mr. Edmondson's ability to enter his fields for the purpose of further cultivation and harvest.

111.    On July 11, 2017, Mr. Edmondson filed form CCC-576, "Notice of Loss," reporting that heat and excess moisture/precipitation that started on June 19, 2017, caused his summer squash crop loss. Mr. Edmondson reported that his loss was apparent to him on July 11, 2017. Mr. Edmondson also reported that he abandoned his fields on July 11, 2017.

112.    On August 16, 2017, more than a month after Mr. Edmondson filed his notice of loss and abandoned his fields, and approximately two months after having

26

found the fields and plants generally in good condition, the LA started inspecting Mr. Edmondson's fields completing the same on August 17, 2017. The LA took photos and reported that he saw fields with rotten and dried out squash, large overripe squash, plants dead, dried out excessive growth of weeds, grasses, volunteer peanuts throughout some fields.

113.    On November 16, 2017, the Agency's Acting Deputy Administrator for Farm Programs (ADAFP) denied Mr. Edmondson's application for a 2017 NAP payment for his claimed losses. The ADAFP claimed that Mr. Edmondson employed inadequate weed control measures; he failed to timely harvest (or gather crop that did successfully grow and mature); he did not meet the definition of a producer because he provided insufficient information regarding his plans for harvesting and marketing.

114.    On December 7, 2017, Mr. Edmondson unsuccessfully appealed to the National Appeals Division (NAD). (NAD Case No. 2018S000128, File 1, Tab 2)

### Count 5
(Charles McGriff)

115.    Petitioner Charles McGriff incorporates foregoing paragraphs one through fifty-nine (1-59), as if set herein verbatim.

116.    Petitioner Charles McGriff has farmed for more than 40 years, growing primarily cotton and peanuts on 75 acres of his family's land. Petitioners has also grown small accounts of tomatoes, squash, okra, peas, and watermelons for neighbors, friends, and family.

117.   On June 12, 2017, for his 2017 NAP coverage, Mr. McGriff filed an acreage report providing he had planted at total 23.2 acres of squash, and 25.5 acres of watermelons.

118.   Mr. McGriff stated that excessive rain began on June 19, 2017 and reported his loss became apparent on July 5, 2017.

119.   On July 5, 2017, Mr. McGriff visited the Agency's local office to file a notice of loss claiming excess moisture caused a loss on all acres where his squash and watermelon were planted.

120.   On October 24, 2017, the Agency disapproved Mr. McGriff's notice of loss based on insufficient evidence of excess moisture and failure to provide a harvesting and marketing plan.

121.   On November 15, 2017, the Agency denied Mr. McGriff's claim adding that the Petitioner failed to provide proper pollination or maintain adequate documentation of his production.  The Agency's stated that Mr. McGriff failed to provide adequate pollination, simply because he failed to provide pollination to his fields exactly as was "recommended" is an abuse of discretion.

## Count 6
### (Reuban Womack dba "RJ Farms")

122.   Petitioner Reuben Womack incorporates the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

123.   On February 1, 2017, Mr. Womack obtained NAP coverage for its planned watermelon crop.

124.    On August 9, 2017, Mr. Womack purchased greenhouse-grown watermelon plants for transplanting, and provided a receipt to the Agency verifying the purchase.

125.    Prior to transplanting the watermelons, Mr. Womack applied the herbicide "Liberty" as a "burndown" to kill all existing grasses and weeds in preparation for transplanting on August 2, 2017.

126.    In addition to the Liberty application, Mr. Womack also applied the herbicide "Sandea" prior to transplanting the watermelons. Following the Sandea application, Mr. Womack manually pulled weeds in the field beginning on August 19, 2017, through August 25, 2017.

127.    On August 13, 2017, Mr. Womack transplanted the watermelons onto 31 acres. During planting period 01, in the immediately preceding Spring, a prior crop of watermelons was planted on the same 31 acres. Because there was a prior crop of watermelons grown on the same acres, plastic mulch and drip tape for growing the watermelons were already in place.

128.    On September 20, 2017, Mr. Womack submitted a notice of loss for the watermelon crop, reporting that the crop experienced a loss resulting from disastrous weather conditions including excessive moisture, excessive wind and insect infestation. The notice of loss indicated the beginning date of the disaster as September 11, 2017, and that the loss first became apparent on September 18, 2017.

129.    On September 27, 2017, an Agency loss adjuster inspected Mr. Womack's watermelon crop and provided a report of the inspection that included photographs. The

adjuster's report notes Mr. Womack reporting that the field of melons received excessive rainfall after "planting" along with high winds from a recent hurricane. The adjuster further noted that the watermelons were planted in old plastic covered beds that were drip irrigated. The melons on the vines had not grown much in length, the leaves on most were browning up, and the vines had started dying. He noted small melons ranging in size from a golf ball to a softball. The field had residue from watermelons, plants, and vines from planting period 01. Finally, the adjuster noted that the field had established mature pigweed growing in it, along with other weeds growing throughout.

130.    On February 16, 2018, Mr. Womack filed an application for NAP payment losses to its watermelon crop.

131.    On April 18, 2018, the Agency denied Mr. Womack's notice of loss and application for payment by determining that: (1) the claimed weather event did not impact Mr. Womack's crop as claimed, and (2) Mr. Womack failed to follow good farming practices, to include improper herbicide application and failure to control weeds.

132.    The Agency claimed that Mr. Womack failed to follow good farming practices for the crop because he did not follow the practices as recommended in the 2017 Southeastern Vegetable Crop Handbook and other publications prepared by employees of the agricultural departments of universities.

### Count 7
(John & Geraldine Bowen)

133.    Petitioners John Bowen and Geraldine Bowen incorporate the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

134.    John and Geraldine Bowen own the land where the pepper plants were planted. They entered into a crop sharing agreement with a third party who was to assist in the farming operation and in exchange for his efforts receive a share of the profits.

135.    On February 28, 2017, John & Geraldine obtained NAP coverage for the planned green bell pepper crop.

136.    The Bowens purchased pepper plants on March 31, 2017 and April 18, 2017, they provided a receipt to the Agency verifying the purchase.

137.    On July 10, 2017, the Bowens established the pepper plants by transplanting the peppers in her fields setting the seed 18 inches apart with 4,800 per acre. The peppers were transplanted on 44.37 acres. The Bowens certified that a 100 percent share of the pepper crop planted on the farm.

138.    The Bowen's plans for harvesting and marketing her crop included packing the crop in the fields using pick-up trucks and selling any crop harvested to farmer's markets throughout the region.

139.    Prior to transplanting the peppers, the weather at the Bowen's farm had been very dry. After the peppers were transplanted there were a few, brief rain showers followed by periods of sun exposure which resulted in the pepper plants scalding.

140.    On July 17, 2017, Geraldine Bowen filed a notice of loss in which she reported that excessive moisture/precipitation caused losses to her crop beginning on July 13, 2017, and that her crop loss first became apparent on July 17, 2017.

141.    On August 23, 2017, more than a month after the crop loss an Agency loss adjuster conducted an inspection of the Bowen's pepper fields that included a report of the inspection along with photographs. The inspector reported that all the fields were "solid with nutsedge, pigweeds, morning glory vines and crabgrass".

142.    On February 27, 2018, the Bowens filed an application for NAP payment for losses to her green bell peppers.

143.    On May 16, 2018, the Agency denied the Bowens notice of loss and application for payment by determining that: (1) the claimed weather event did not impact Mr. and Mrs. Bowens' crop as claimed, (2) they failed to follow good farming practices, (3) they did not provide sufficient information to show that she is a producer who had an actual risk in growing the crop; and (4) they provided insufficient information about her plans for harvesting and marketing to show that she had an intent to harvest the crop.

### Count 8
(Everett Tolar)

144.    Petitioner Everett Tolar incorporates the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

145.    Mr. Tolar is the administrator of an estate that owns a farm identified as Farm 5065 (or the Farm). As administrator of the estate, Mr. Tolar managed the share crop lease of the Farm to Tim Harper (the Lessee) for the 2017 crop year. The Lessee planted green bell peppers and soybeans on the Farm. Under the lease arrangement, the estate furnished the land and procured NAP coverage and was to receive one third of the

proceeds from the peppers produced on the Farm. The Lessee provided his labor, seeds and/or transplants, fertilizer and herbicides and was to receive the remaining crop proceeds to cover his share of crop and to cover all the pepper production costs.

146. On February 21, 2017, Mr. Tolar obtained NAP coverage for 2017 crops of peppers and other vegetables. Mr. Tolar obtained the NAP coverage by filing an application for NAP coverage at his local FSA office. When Mr. Tolar filed his application for NAP coverage, he certified that he had received CCC-471 NAP BP, also referred to as the NAP 2016 and Subsequent Years Basic Provisions (or the Basic Provisions). The Basic Provisions set forth the terms and conditions of Mr. Tolar's NAP coverage.

147. The Basic Provisions specified that in the event of damage to any NAP covered crop, at least one producer having a share in the crop must, for hand-harvested crops, notify FSA of the damage or loss within 72 hours of the date the damage or loss first became apparent, and for low yield claims the producer must file a written notice of loss in the administrative FSA county office the earlier of 15 days after the disaster occurrence or date of loss or damage to the crop became apparent, or 15 days after the normal harvest date. The Basic Provisions specified that the producer's notice of loss must include the cause of the crop damage, the date the disaster occurred, and the date the damage or loss became apparent.

148.    On July 18, 2017, the Lessee transplanted green bell peppers to 19.52 acres on Farm 5065. The Lessee purchased the pepper plants, and he paid all the costs associated with producing the pepper crop.

149.    After transplant of the peppers most of the plants died following a period of drought and/or dry, hot weather with only a light shower of rain.

150.    On July 24, 2017, Mr. Tolar submitted a NAP notice of loss to the local FSA office. Mr. Tolar reported in the notice of loss that an event of excess moisture/precipitation had caused losses to the subject pepper crop beginning July 21, 2017, and that the losses became apparent on July 24, 2017.

151.    On August 23, 2017, FSA had a loss adjuster inspect the pepper crop. The loss adjuster noted that very few peppers were alive, and most of the peppers consisted of dead stems.

152.    On February 27, 2018, the Lessee informed the local FSA office that he wished to complete an application for NAP payment for Mr. Tolar's loss claim. FSA provided the Lessee the necessary application, and the Lessee carried the application to Mr. Tolar. Mr. Tolar signed the application certifying that no peppers had been produced for harvest on the Farm in 2017. The signed application was then submitted to FSA on February 28, 2018.

153.    As Mr. Tolar had reported in his notice of loss that excess moisture/precipitation had caused losses to the pepper crop beginning July 21, 2017, and

that the losses had become apparent on July 24, 2017, FSA obtained PRISM rainfall data for the Farm for the period from July 21, 2017, through July 24, 2017.

154.    After reviewing Mr. Tolar's loss claim and the rainfall data from PRISM, FSA disapproved the loss claim because: (1) the rainfall at Mr. Tolar's farm from July 21, 2017, to July 24, 2017, was not, based solely on the PRISM rainfall date, excessive, and the claimed weather event did not cause a loss to the crop; (2) the losses to Mr. Tolar's crop were, in the opinion of FSA, the result of a failure to follow good farming practices; and (3) Mr. Tolar did not provide FSA sufficient information to show that he was an eligible producer who shared in the risk of producing the crop.

### Count 9
(Manley Tolar)

155.    Petitioner Manley Tolar incorporates foregoing paragraphs one through fifty-nine (1-59), as if set herein verbatim.

156.    Mr. Tolar is a second-generation fruit and vegetable farmer. Mr. Tolar and his family have developed several buyers for their produce including grocery stores and two brokers from different distribution centers. They also sell their produce at farmers' markets.

157.    On May 8 and 11, 2017, Mr. Tolar planted 52.77 acres in squash. His expected or approved yield for squash was 7,118 pounds per acre. His approved yield from 52.77 acres totaled 368,499 pounds.

35

158.    Mr. Tolar initially obtained a poor standard of squash because of little rain, and then excess rainfall flooded his fields, causing further damage to the crop.

159.    Mr. Tolar harvested squash between June 3, 2017, and July 15, 2017. In total, Mr. Tolar claimed that he harvested 630 pounds of squash, which he sold in 21 boxes that each weighed 30 pounds.

160.    Mr. Tolar typically uses pick crews to pick, wash, and box his produce, and he typically keeps records of his payment to the pick crews and receipts identifying the date and quantity of sales to large volume buyers. However, Mr. Tolar did not hire pick crews or have any other receipts for the few boxes of squash he harvested in 2017. Instead, Mr. Tolar sold the 21 boxes of squash that he harvested to his daughter-in-law for $15.00 a box. She then sold the squash at the local farmer's market for $1.00 a pound or $15 a box to unidentified buyers.

161.    Mr. Tolar provided FSA a notice of loss claiming that excess moisture caused losses to his squash crop. FSA assigned a loss adjuster to inspect and appraise Mr. Tolar's production. The loss adjuster appraised the unharvested production that remained in Mr. Tolar's field, and he determined that the appraised production totaled 179,771 pounds.

162.    On October 26, 2017, Mr. Tolar filed an application for NAP payment. He certified in his application that he had produced 180,041 pounds squash, which included 630 pounds of harvested production and 179,771 pounds of appraised production.

163.    Mr. Tolar supplied FSA a record of his squash production consisting of five receipts from a receipt book.  The receipts provide the following information on the sale 21 boxes of squash from June 17, 2017, to July 15, 2017:

164.    On November 29, 2017, FSA's Deputy Administrator denied Mr. Tolar's application because (1) Mr. Tolar had failed to control weeds and this resulted in FSA assigning production equal to Mr. Tolar's NAP guarantee, and (2) Mr. Tolar had failed to provide verifiable records of his production.

## Count 10
(Benjamin Coty Taylor)

165.    Petitioner Benjamin Taylor incorporates foregoing paragraphs one through forty-five (1-45), as if set herein verbatim.

166.    On January 30, 2017, Mr. Taylor purchased NAP coverage for a non-irrigated bell pepper crop that was to be planted on farmland leased from his father.

167.    In preparation of his 2017 bell pepper crop, Mr. Taylor purchased bell pepper transplants, herbicide and fertilizer on his father account.  At the time of filing his appeal Petitioner still owed money for the credit purchases.

168.    On March 28, 2017, Mr. Taylor planted 35 acres of bell pepper transplants on Farm Serial Number (FSN) 1745.

169.    On April 30, 2017, Mr. Taylor planted 26 acres of bell pepper transplants on FSN 3417.

170.    From April 11 through May 30, 2017, US Drought Monitor indicated Mr. Taylor's county experienced abnormally dry, moderate drought, or severe drought

conditions. This was not inconsistent with Mr. Taylor's testimony that his crops received some rain in April but did not began to receive excessive rain until around June 1, 2017. A few days of noticeable rain is not enough to counter the presence or absence of a drought.

171.   From June 6 through July 4, 2017, US Drought Monitor indicated no drought conditions.   This ignores evidence the crops, especially the size of young transplants may have already been damaged by previous drought conditions that lasted more than a month.

172.   On June 30, 2017, Mr. Taylor harvested and sold as invoiced his bell pepper crops.   This fact does not discredit Mr. Taylor's claim that excessive rainfall caused his bell pepper crop to fail, because he could not plow the weeds or harvest his crop in early June during the time of excessive rain, and to deny his claim based merely on assumptions made by the Agency's inspector was arbitrary and is an abuse of discretion.

173.   On August 7, 2017, having been previously barred from doing so by an Agency employee, Mr. Taylor filed a Notice of Loss (CCC-576) reporting excess moisture/precipitation as the cause.   Under Part 9 of NAP Notice of Loss as stated: "Producer certifies that all information in Part B is correct, whether personally entered by the producer or another party and acknowledges receipt of copy of this form." Petitioner is certifying the information is correct, not that it is all inclusive.   Denying a claim

because it is not entirely inclusive as to every factor affecting Mr. Taylor's loss is arbitrary and capricious.

174.   On August 21, 2017, the Agency's Loss Adjuster inspected Mr. Taylor's fields noting non-crop vegetation, indicative of a field that had been harvested approximately two months before.

175.   On November 16, 2017, the Agency informed Mr. Taylor that he was not eligible for a 2017 NAP payment for his crop loss. The Agency determined that (1) the weather conditions of excess moisture/precipitation that Mr. Taylor stated caused his crop loss did not impact his crop as reported; (2) Mr. Taylor did not report his loss timely for a timely crop inspection; (3) Mr. Taylor did not meet the definition of a producer because he provided insufficient information about his harvesting and marketing plans; and (4) Mr. Taylor's production documents were not reliable.

176.   Mr. Taylor unsuccessfully appealed the Agency's decision to the National Appeals Division (NAD).  (NAD Case No. 2018S000142, File 1, Tab 2)

### Count 11-14
(Tony Taylor, Holly Taylor, A.B. Carroll, Tracy Carroll)

177.   Petitioners Tony Taylor, Holly Taylor, A.B. Carroll, and Tracy Carroll incorporate the foregoing paragraphs one through fifty-nine (1-59), as if set herein verbatim.

178.   Tony Taylor and Holly Taylor are husband and wife. A.B. Carroll, and Tracy Carroll are father and daughter. Mr. Taylor and Mr. Carroll have farmed their whole lives and represented their families at the hearing.

179.   The Taylors and Carrols jointly own 158 acres of crop fields located on Farm 4638 Tract 995 in the records of the Agency.  Some woods serve as windbreaks between some of the fields, but the fields are otherwise contiguous.

180.   In 2017, Petitioners decided to grow green bell peppers commercially on the fields.  Petitioners intended to and did use the same farming practices on all fields.

181.   On July 14, 2017, Mr. Carroll submitted a Notice of Loss for himself, and Tracy Carroll.  In the loss notices, Mr. Carroll asserted that all of their acres of green bell peppers suffered a loss from excess moisture that began on June 1, 2017.  The loss notices claimed that the loss became apparent the previous day (July 13, 2017).

182.   On July 17, 2017, Mr. Taylor submitted a Notice of Loss for himself and Holly Taylor.  In the loss notices, he asserted that all of their acres of green bell peppers suffered a loss from excess moisture that began on May 29, 2017.  The loss notices claimed that the loss became apparent on July 6, 2017.

183.   Petitioners harvested some peppers before they submitted their Notices of Loss, but they abandoned the crop when they submitted their Notices of Loss.

184.   When Petitioners submitted their Notices of Loss, the Agency provided them an attachment to complete and return, identifying the farming practices they used to develop the crop, including soil testing, land preparation, tillage, herbicides, insecticides, and fertilizers.  The attachment also requested that Petitioners provide a copy of invoices for their inputs into the crop and information concerning their harvesting and marketing plans.

185.    Petitioners did not provide soil tests, but they stated that they disced the fields five times and cultivated the fields twice before planting. For fertilizer, they used 175 pounds of 17-17-17 per acre before planting. For a pre-plant herbicide, they stated that they used one pint of Trifluralin per acre and planted 5,000 transplants per acre. After planting, they cultivated (plowed) the row middles for weeds three times.

186.    Each Petitioner submitted an invoice billed to Mr. Taylor for 554,400 transplants.

187.    On July 25, 2017, the Agency made a post notice of loss inspection of Petitioners' fields. The Agency noted that there did not appear to have been any plowing or new production in the last three weeks, and the plants were shutting down. The fields still had various size, but mostly small, overripe peppers. The Agency noted that Petitioners had recently sprayed the tall weeds, but they had not controlled the lower weeds since the Agency's last visit.

188.    The Agency denied their claims for failure to follow good farming practices (not enough fertilizer, not enough plants, inadequate weed control, failure to timely harvest, and no soil tests). The notifications to Mr. Taylor and Mr. Carroll also identified their failure to timely notify the Agency of their loss within 72 hours of the time the loss first became apparent.

## Count 15
### (Ashley Ingram)

189.    Petitioner Ashley Ingram incorporates foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

## Jalapeno Peppers

190.    On January 31, 2017, Mr. Ingram renewed his application to participate in the NAP for a variety of fruits and vegetables, including jalapeno peppers. Then, on May 21, 2017, he planted one 3.1-acre field of irrigated jalapeno peppers.

191.    On July 15, 2017, Mr. Ingram filed a notice of loss reporting that excess moisture had damaged his crop. In the notice of loss, Mr. Ingram asserted that rain began on June 17, 2017, and the loss became apparent on July 15, 2017, the day he filed his notice of loss.

192.    On August 10, 2017, an adjustor inspected and photographed Mr. Ingram's field. The adjustor took sample plots and determined that Mr. Ingram had approximately 3,445 pounds per acre of jalapeno peppers left in the field unharvested.

193.    Mr. Ingram explained that he did not harvest the peppers because a buyer to whom he intended to sell the peppers advised him that his crop was not marketable based on several problems including blossom end rot, which the buyer described in an e-mail as being caused by "copious" amounts of rain. Mr. Ingram explained that the rain affected all the buyer's growers throughout the Southeastern United States

194.    On February 5, 2018, Mr. Ingram applied for payment under the program and certified that his actual production of jalapeno peppers totaled 252 pounds.

195.    On April 12, 2018, the Agency denied Mr. Ingram's application for benefits. The Agency determined that he did not prove that excess moisture caused a loss. The Agency also determined that Mr. Ingram used herbicides (Sinbar and Sonolan)

not labeled gor peppers and failed to control weeds in the crop. Finally, the Agency claims Mr. Ingram failed to maintain acceptable records of his production.

196.   Mr. Ingram unsuccessfully appealed to the National Appeals Division (NAD). (NAD Case No. 2018S000398, 2018S000479, 2018S000457)

## Sugar Baby Watermelons

197.   On April 10 and April 28, 2017, Mr. Ingram planted 1.97 acres of irrigated sugar baby watermelon transplants in two fields on the same farm and tract.

198.   On July 15, 2017, Mr. Ingram filed a notice of loss claiming that excess moisture damaged his crop. In the notice of loss, he claimed that the rain began on June 20, 2017, and the loss became apparent on July 15, 2017, the day he filed his notice of loss. Mr. Ingram indicated that he had or would harvest his crop, and he did not need an appraisal of the crop in the field at that time.

199.   In February 2018, Mr. Ingram applied for payment under the program and certified that his actual production for sugar baby watermelons totaled 6,000 pounds.

200.   On May 2, 2018, the Agency denied Mr. Ingram's application for benefits. The Agency determined that he failed to prove that excess moisture caused a loss. The Agency also determined that Mr. Ingram impermissibly double-cropped the watermelons after oats intended for grazing and that the benefit period ended before Mr. Ingram\ reported the claimed loss. Finally, the Agency claims that Mr. Ingram failed to control weeds and timely harvest the crop, and he failed to maintain acceptable records of his production. )

201.   Mr. Ingram unsuccessfully appealed to the National Appeals Division (NAD).  (NAD Case No. 2018S000499, 2018S000505)

## Count 16
### (Dawn Ingram)

202.   Petitioner Dawn Ingram incorporates foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

203.   Mrs. Ingram's family grows a variety of crops in Houston County, Alabama.  Her husband manages the farming operation on behalf of the family, and he represented her at the hearing.

204.   Mrs. Ingram applied to participate in the NAP for a variety of fruits and vegetables, including freestone peaches, cherry eggplant, red chili peppers, and seedless watermelons.

205.   On July 15, 2017, Mrs. Ingram filed a notice of loss claiming that excess moisture damaged her crops.  In the notice of loss, she claimed that the rain began on June 15, 2017, and the loss became apparent on July 15, 2017, the day she filed her notice of loss.

206.   On August 10, 2017, an adjustor met with Mrs. Ingram's husband and inspected and photographed her field.

207.   On February 8, 2018, Mrs. Ingram applied for payment under the program and certified that her actual production of cherry eggplants totaled 4,925 pounds, her actual production of seedless watermelons totaled 16,620 pounds, and that she did not have any production form her peach trees. On that same date, Mrs. Ingram's husband

44

applied for payment under the program on her behalf and certified that her actual production of seedless watermelons totaled 1,197 pounds.

208.   On February 9, 2018, Mrs. Ingram applied for payment under the program and certified that her actual production of red chili peppers totaled 105 pounds.

209.   On May 10, 2018, the Agency disapproved Mrs. Ingram's notice of loss regarding her peach trees.  The Agency explained that it had not approved peaches, or any crop in Mrs. Ingram's county, for insufficient chill hours in advance of the benefit period.  Therefore, insufficient chill hours did not serve as an independent qualifying cause of loss in the absence of a damaging weather event or other adverse natural occurrence that caused the area to suffer insufficient chill hours.

210.   On May 16, 2018, the Agency denied Mrs. Ingram's application for benefits regarding her seedless watermelon, red chili peppers, and (period 2) seedless watermelon crops.  The Agency determined that she failed to prove that the claimed qualifying events caused a loss and that her watermelon vines were dead before the first recorded frost. The Agency also determined that, without proof of frost or excessive wind damaging her crop, plant disease would not serve as a qualifying event for NAP benefits.  Finally, the Agency determined that Mrs. Ingram failed to provide acceptable records of her production.

211.   On May 24, 2018, the Agency denied Mrs. Ingram's application for benefits regarding her cherry eggplant crop. The Agency determined that she did not prove that excess moisture caused a loss.  The Agency also determined that she failed to

timely harvest her crop and provide acceptable records of her production. The Agency specifically noted that Mrs. Ingram had not provided any records of her September 14, 2017 harvest.

212.    Mrs. Ingram unsuccessfully appealed the Agency's decision to the National Appeals Division. (Case No. 2018000497, 2018S000520-523)

## Count 17
### (Sara Ingram)

213.    Petitioner Sara Ingram incorporates foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

214.    On February 1, 2017, Mrs. Ingram applied to participate in the NAP for a variety of fruits and vegetables, including summer squash, crookneck squash, seedless watermelons, green bell peppers, and cantaloupe.

215.    March 28 and April 15, 2017, Mrs. Ingram planted 7.7 acres of irrigated seedless watermelon transplants in two fields on two tracts of the same farm. Specifically, on March 28, 2017, Mrs. Ingram planted 7.10 acres on Tract 3083, and on April 15, 2017, she planted .60 acres on Tract 9813. On May 15, 2017, Mrs. Ingram planted 14.26 acres of squash in two fields on the same farm and tract.

216.    When Mrs. Ingram signed her acreage report identifying the date, farm, tract, and field on which she planted the squash, the acreage report simply listed the squash as summer squash without any reference to a pay crop code or a pay type code.

46

217.   Although Mrs. Ingram's son had grown squash in his name, she had never personally grown squash for the fresh commercial market, and the Agency assigned her the county expected yield of 7,800 pounds of squash per acre.

218.   On July 15, 2017, Mrs. Ingram filed a notice of loss claiming that excess moisture had damaged her crops. In the notice of loss, she claimed that the rain began on June 18, 2017, and the loss became apparent on July 15, 2017, the day she filed her notice of loss. On the notice of loss, Mrs. Ingram indicated that she either had or would harvest her crops and that she did not need to request an appraisal of the crop in the field at that time.

219.   Mrs. Ingram did not harvest anything from her fields. Her son explained that the buyer to whom he intended to sell their crops advised him that they were not accepting any crops from the Southeastern United States due to the excessive rainfall received in the Southeastern United States.

220.   On August 10, 2017, an adjustor inspected and photographed Mrs. Ingram's field. By that time, however, weeds and grasses had completely overtaken the field, and the plants had deteriorated to the point that there was nothing left to measure or appraise.

221.   On February 8, 2018, Mrs. Ingram applied for payment under the program and certified that she had no production from her fields. Mrs. Ingram's son applied for payment under the program on her behalf and certified that Mrs. Ingram's actual production of seedless watermelons totaled 2,160 pounds.

222.    On May 2, 2018, the Agency denied Mrs. Ingram's application for benefits regarding her squash crops. The Agency determined that Mrs. Ingram did not prove that excess moisture caused a loss.  The Agency also determined that Mrs. Ingram certified that she planted summer squash and claimed a loss on summer squash, but she actually planted crookneck squash.  Finally, the Agency claims Mrs. Ingram failed to sufficiently seed and control weeds in the crop, and she failed to timely harvest the crop. (Case No. 2018S000496)

223.    On May 24, 2018, the Agency denied Mrs. Ingram's application for benefits regarding her seedless watermelons.  The Agency determined that Mrs. Ingram failed to prove that excess moisture caused a loss.  The Agency also determined that Mrs. Ingram impermissibly double-cropped .6 of the 7.7 acres of watermelons after oats intended for grazing and that the benefit period ended before Mrs. Ingram reported the claimed loss.  Finally, the Agency determined that Mrs. Ingram failed to timely harvest the crop and maintain acceptable records of her production. (Case No. 2018S000524)

224.    On November 6, 2018, the Agency denied Mrs. Ingram's application for benefits regarding her cantaloupe and green bell pepper crops. The Agency determined that Mrs. Ingram failed to prove that excess moisture caused a loss.  In addition, the Agency determined that Mrs. Ingram double-cropped her acreage without approval, failed to timely notify the Agency of her loss, failed to timely notify the Agency that her harvest was complete, provided unacceptable production records, and further that she did not meet the definition of a producer. (Case No.s 2019S000087 & 2019S000088)

**Count 18**
(Kent Ingram)

225.   Petitioner Kent Ingram incorporates foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

226.   On January 31, 2017, Mr. Ingram applied to participate in the NAP for a variety of fruits and vegetables, including cubanelle peppers, summer squash, and seedless watermelon.

227.   On March 25, 2017, Mr. Ingram planted 6.7 acres of irrigated seedless watermelons. With his irrigated practice, Mr. Ingram covered the raised beds with plastic to assist with the irrigation, fertigation, and control of soil temperatures.

228.   On May 10, 2017, Mr. Ingram planted one acre of crookneck squash.

229.   On May 21, 2017, Mr. Ingram planted one three-acre field of irrigated cubanelle peppers.

230.   Mr. Ingram had never grown cubanelle peppers, and the Agency assigned him the county expected yield of 13,000 pounds per acre, or a total of 39,000 pounds for the three acres.

231.   On July 15, 2017, Mr. Ingram filed a notice of loss claiming that excess moisture had damaged his crops. In the notice of loss, Mr. Ingram asserted that rain began on June 15, 2017, and the loss became apparent on July 15, 2017, the day he filed his notice of loss.

232.    On August 10, 2017, an adjustor inspected and photographed Mr. Ingram's field.  The adjustor took sample plots and estimated that Mr. Ingram had approximately 3,445 pounds per acre of cubanelle peppers left in the field unharvested.

233.    Mr. Ingram explained that a buyer to whom he intended to sell the peppers advised him that his crop was not marketable based on several problems including blossom end rot, which the buyer described in an e-mail as being caused by "copious" amounts of rain.  Mr. Ingram explained that the rain affected all the buyer's growers throughout the Southeastern United States.  Mr. Ingram's buyer did not testify at the hearing, and he admitted that he did not know how long cubanelle peppers took to mature or how much water they required.

234.    On February 9, 2018, Mr. Ingram applied for payment under the program and certified that his actual production of cubanelle peppers totaled 336 pounds.

235.    On March 29, 2018, the Agency denied Mr. Ingram's application for benefits regarding his pepper and squash crops. The Agency determined that Mr. Ingram did not prove that excess moisture caused a loss.  The Agency also claims that Mr. Ingram failed to control weeds and timely harvest the crop and that he failed to maintain acceptable records of his production.

236.    On April 12, 2018, the Agency denied Mr. Ingram's application for benefits regarding his watermelon squash.  The Agency determined that Mr. Ingram failed to prove that excess moisture caused a loss.  The Agency also determined that Mr. Ingram completed his harvest on June 20, 2017.  Therefore, the Agency determined that Mr.

Ingram failed to timely report a loss and that the benefit eligibility period ended on June 20, 2017. Finally, the Agency determined that Mr. Ingram's receipt to an unidentified buyer did not qualify as an acceptable record of his production.

## Count 19
### (Victoria Ingram)

237.   Petitioner Vitoria Ingram incorporates foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

238.   On January 31, 2017, Mrs. Ingram obtained NAP coverage for her planned watermelon crop.

239.   On March 28, 2017, Mrs. Ingram transplanted 4.20 acres of watermelons on Farm 2557.

240.   On May 1, 2017 and May 10, 2017, she planted 3.70 and 8.10 acres of watermelons on Farm 5372. Mrs. Ingram planted a total of 16 acres of irrigated watermelons using drip plastic irrigation on both farms. The report of commodities shows Mrs. Ingram as having a 100 percent share in the crop.

241.   On July 15, 2017, Mrs. Ingram filed a notice of loss claiming that excess moisture damaged all of her 16 acres of watermelons on both farms.  In the notice of loss, she asserts that the rain began on June 17, 2017, and the loss became apparent on July 15, 2017. Mrs. Ingram indicated that she had or would harvest her crop, and she did not need an appraisal of the crop in the field at that time.

242.   On August 16, 2017, an Agency loss adjuster conducted a final inspection of Mrs. Ingram's watermelon crop.  The adjuster found watermelons still in Mrs.

Ingram's fields.  The adjuster appraised the watermelons left in the field on Farm 2557 at 6,160 pounds per acre and the watermelons left in the field on Farm 5372 at 2,450 pounds per acre.

243.  On November 6, 2018, the Agency denied Mrs. Ingram's application for benefits.  The Agency asserted that she had failed to prove that excess moisture caused a loss.  In addition, the Agency asserted that Mrs. Ingram failed to timely notify the Agency of her loss, failed to timely harvest her crop, provided unacceptable production records, and, further, that she does not meet the definition of a producer.  (Case No. 2019S000104)

### Count 20
### (Troy Adams d/b/a 4G Hay Farms)

244.  Petitioner Troy Adams incorporates foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

245.  In February 2017, Troy Adams applied for NAP coverage for several crops, including summer and crookneck squash, and acknowledged receipt of the NAP's Basic Provisions.

246.  Since Mr. Adams was a new producer of squash and had not established any history of prior yields, the Agency assigned Mr. Adams an anticipated or approved yield based on the county expected yield of 7,800 pounds of squash per acre.

247.  On July 5, 2017, all Mr. Adams filed notices of loss.  In the notice, Mr. Adams advised the Agency that they had planted 152.5 acres of squash on two farms and claimed that excess moisture damaged all acres of their squash.  Mr. Adams claimed the

rain began on June 19, 2017, and losses became apparent on July 5, 2017, the day he filed his notices of loss.  The notices advised the Agency that Mr. Adams had or intended to harvest the crop and that they did not need to request an appraisal of the crop in the fields at that time.

248.    On July 27 and August 2, 2017, a loss adjustor inspected and photographed Mr. Adams' fields.  Mr. Adams met the adjustor for the inspections and explained that excessive rainfall affected the quality of the blooms and the squash.  The adjustor noted that the fields had fair stands of small to medium size plants with overripe squash, and some plants still had blooms, but most of the plants were either dead or dying at that time.  He also noted that the fields had a lot of weeds and grasses.

249.    On October 24, 2017, the Agency disapproved Mr. Adams' notices of loss. At that time, the Agency determined that: (a) excess moisture did not damage Mr. Adams' crops; (b) Mr. Adams' failed to timely harvest the squash; (c) Mr. Adams' filed his acreage reports and notices of loss indicating that he planted summer squash, but Mr. Adams planted yellow crookneck squash; and (d) Mr. Adams' receipts indicate that he did not purchase seed until after the final planting date.

250.    Mr. Adams unsuccessfully appealed to the National Appeals Division (NAD).  (NAD Case No. 2018S000352)

### Count 21
(Lisa Peterson)

251.    Petitioner Lisa Peterson incorporates foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

252.   In February 2017, Lisa Peterson applied for NAP coverage for several crops, including summer and crookneck squash, and they acknowledged receipt of the NAP's Basic Provisions.

253.   Lisa Peterson was a new producer of squash and had not established any history of prior yields, therefore the Agency assigned Mrs. Peterson an anticipated or approved yield based on the county expected yield of 7,800 pounds of squash per acre.

254.   On July 5, 2017, all Mrs. Peterson filed notices of loss. In the notice, Mrs. Peterson advised the Agency that she had planted 152.5 acres of squash on two farms and claimed that excess moisture damaged all acres of their squash. Mrs. Peterson claimed the rain began on June 19, 2017, and their losses became apparent on July 5, 2017, the day they filed their notices of loss. The notices advised the Agency that Mrs. Peterson had or intended to harvest the crop and that they did not need to request an appraisal of the crop in the fields at that time.

255.   On July 27 and August 2, 2017, a loss adjustor inspected and photographed Mrs. Peterson's fields. The adjustor noted that the fields had fair stands of small to medium size plants with overripe squash, and some plants still had blooms, but most of the plants were either dead or dying at that time. He also noted that the fields had a lot of weeds and grasses.

256.   On October 24, 2017, the Agency disapproved Mrs. Peterson's notices of loss. At that time, the Agency determined that: (a) excess moisture did not damage Mrs. Peterson's crops; (b) Mrs. Peterson failed to timely harvest their squash; (c) Mrs.

Peterson filed their acreage reports and notices of loss indicating that they planted summer squash, but Mrs. Peterson planted yellow crookneck squash; and (d) Mrs. Peterson's receipts indicate that they did not purchase seed until after the final planting date.

257.    Mrs. Peterson unsuccessfully appealed to the National Appeals Division (NAD). (NAD Case No. 2018S000350).

## Count 22
### (Tim Harper)

258.    Mr. Harper and his wife each have a 50 percent share in farm numbers 2189, 5076, 5233 and 5472. The farms, together, consist of a total of 119.01 acres that were transplanted with green bell peppers.

259.    On February 1, 2017, Mr. Harper obtained NAP coverage for the planned green bell pepper crop.

260.    On May 16, 2017, and June 1, 2017, Mr. Harper transplanted 89.47 acres of green bell peppers on farms 2189 and 5472.

261.    On July 17, 2017, Mr. Harper signed and submitted a notice of loss indicating that the entire 119.01 acres of green bell peppers on farms 2189, 5076, 5233 and 5472 were affected by disastrous weather in the form of excessive moisture and heat. The notice of loss indicated that the disastrous weather event began on June 19, 2017, and that the loss first became apparent on July 17, 2017.

262.    On August 20, 2017, a loss adjuster conducted an inspection of Mr. Harper's pepper crop. The adjuster noted that Mr. Harper stated that different weather

events had adversely impacted the crop to include dry weather early on, with rain and heat later. The adjuster noted that in some fields there were no peppers found, while in other fields the peppers that were there were small, without leaves and many either dead or dying. The adjuster also noted the presence of non-crop vegetation consisting of various weeds and grasses.

263. On October 2, 2017, Mr. Harper signed his approved yield of 140 hundredweight or 14,000 pounds of peppers per acre. Accordingly, at 119.01 acres, Mr. Harper's expected or approved yield totaled 1,666,140 pounds of green bell peppers.

264. On February 27, 2018, Mr. Harper filed an application for NAP payment for losses to his green bell peppers.

265. On May 10, 2018, the Agency denied Mr. Harper's notice of loss and application for payment resulting in Mr. Harper's unsuccessful appeal.

### Count 23
(Cedric Harper)

266. Petitioner Cedric Harper incorporates foregoing paragraphs one through fifty-nine (1-59), as if set herein verbatim.

267. On February 1, 2017, Mr. Harper obtained NAP coverage for his planned collard green crop.

268. On March 29, 2017, and March 30, 2017, Mr. Harper planted 104.86 acres of collard greens.

56

269.   On April 7, 2017, Mr. Harper filed a notice of loss indicating that 104.86 acres of planted collard greens were affected by disastrous weather in the form of excessive moisture. Mr. Harper's notice of loss indicated that the disaster began on April 3, 2017, and that the loss first became apparent on April 7, 2017.

270.   On May 3, 2017, a loss adjuster conducted a follow up inspection of Mr. Harper's collard green fields. The loss adjuster noted very few collard green plants to have germinated from seed. The loss adjuster noted the fields also had additional growth of weeds and grasses since the previous inspection.

271.   On October 2, 2017, Mr. Harper signed his approved yield of 44.25 hundredweight or 4,425 pounds of peppers per acre. Accordingly, at 104.86 acres, Mr. Harper's expected or approved yield totaled 464,005 pounds of collard greens.

272.   On February 27, 2018, Mr. Harper filed an application for NAP payment for losses to his collard greens.

273.   In support of the notice of loss and application for payment, Mr. Harper provided the Agency with input and production documentation and information

274.   The Agency based its determination that the claimed disaster event did not impact Mr. Harper's crop as claimed on rainfall and weather data collected at the location where Mr. Harper's farm is located.

275.   On May 24, 2018, the Agency denied Mr. Harper's notice of loss and application for payment resulting in Mr. Harper's unsuccessful appeal.

**Count 24**
(Maxine Harper)

57

276.   Petitioner Maxine Harper incorporates foregoing paragraphs one through fifty-nine (1-59), as if set herein verbatim.

277.   On February 1, 2017, Mrs. Harper obtained NAP coverage for their 2017 planned green bell pepper crop.

278.   On May 16 and June 1, 2017, Mrs. Harper transplanted a total of 89.47 acres of green bell peppers.

279.   On July 17, 2017, Mrs. Harper submitted a Notice of Loss indicating its entire crop of bell peppers had been destroyed by excessive moisture and heat. Specifically, Mrs. Harper stated they reported to their local Agency office that their pepper losses were a result of dry weather followed by heat and then brief showers that resulted in "scalding" of their peppers.

280.   On August 20, 2017, a loss adjuster conducted an inspection of Mrs. Harper' pepper crop.  The loss adjuster's reporting that Mrs. Harper's fields had dead or dying crops with non-crop vegetation growth based on his visit over a month after Mrs. Harper filed their Notice of Loss.

281.   On May 10, 2018, the Agency denied Mrs. Harper's eligibility for NAP coverage for her 2017 green bell pepper crop loss.

### Count 25
(Via Harper)

282.   Petitioner Via Harper incorporates foregoing paragraphs one through fifty-nine (59), as if set herein verbatim.

283.   On February 1, 2017, Mrs. Harper obtained NAP coverage for their 2017 planned green bell pepper crop.

284.   On May 16 and June 1, 2017, Mrs. Harper transplanted a total of 89.47 acres of green bell peppers.

285.   On July 17, 2017, Mrs. Harper submitted a Notice of Loss indicating its entire crop of bell peppers had been destroyed by excessive moisture and heat. Specifically, Mrs. Harper stated they reported to their local Agency office that their pepper losses were a result of dry weather followed by heat and then brief showers that resulted in "scalding" of their peppers.

286.   On August 20, 2017, a loss adjuster conducted an inspection of Mrs. Harper' pepper crop.   The loss adjuster's reporting that Mrs. Harper' fields had dead or dying crops with non-crop vegetation growth based on his visit over a month after Mrs. Harper filed their Notice of Loss.

287.   On May 10, 2018, the Agency denied Mrs. Harper's eligibility for NAP coverage for her 2017 green bell pepper crop loss.

**Count 26**
(Justin Carroll)

288.   Petitioner Justin Carroll incorporates foregoing paragraphs one through fifty-nine (59), as if set herein verbatim.

289.   Since 2015, Mr. Carroll and his father have farmed various crops together and separately in Houston County, Alabama.

290.    On February 1, 2017, Mr. Carroll purchased NAP coverage for all of the crops he farmed by himself, which included summer squash.

291.    On May 10, 2017, Mr. Carroll planted 52.69 acres of summer squash on his farm, Farm Serial Number (FSN) 2141, Tract 3134, fields 1 and 3.

292.    On May 6, 2017, May 10, 2017, and May 18, 2017, Mr. Carroll purchased herbicides and fertilizer and applied them to his summer squash crop. The receipts that Mr. Carroll received were in his name and his father's name.

293.    On June 6, 2017, the Agency's loss adjuster (LA) completed a growing season inspection of Mr. Carroll's fields. The LA took photos and reported that Farm 2141, Tract 3131, field 1, had a good stand of squash plants, and a lot of the plants were starting to develop small squash. The LA also reported that field 3 also had a good stand of squash plants. The LA reported that none of Mr. Carroll's fields had any weed problems.

294.    Beginning June 19, 2017, heat and excess moisture/precipitation affected all of Mr. Carroll's fields.

295.    On July 6, 2017, Mr. Carroll filed form CCC-576, "Notice of Loss," reporting that heat and excess moisture/precipitation that started on June 19, 2017, caused his summer squash crop loss. Mr. Carroll reported that his loss was apparent to him on July 6, 2017.

296.    Mr. Carroll harvested 320 pounds of squash sometime in June 2017, but he donated his harvest to two church food pantries. Mr. Carroll received receipts from each pantry.

297.    The Agency's loss adjuster (LA) inspected Mr. Carroll's fields on August 18, 2017, approximately 33 days after Mr. Carroll reported his loss. The LA reported that he did not see any marketable production. The LA reported that he saw a substantial number of weeds in the fields.

298.    On November 16, 2017, the Agency's Acting Deputy Administrator for Farm Programs (ADAFP) determined that Mr. Carroll was not eligible for a 2017 NAP payment for his claimed losses. The ADAFP determined that Mr. Carroll did not meet the definition of producer, and his production documents were unacceptable because they were not verifiable or reliable.

### Count 27

### (John McDaniel)

299.    Petitioner John McDaniel incorporates the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

300.    The McDaniel family share a farm, approximately one thousand acres divided into four fields, each growing green bell pepper transplants.

301.    The McDaniel's purchased green bell pepper plants, which were seeded in a greenhouse on March 10, 2017. John McDaniel transplanted the bell peppers on his field on May 30, 2017.

302.    John McDaniel filed a notice of loss for his respective field on July 18, 2017, stating that drought and heat caused a loss to the green bell pepper plants.

303.    On August 17, an FSA loss adjuster met with John McDaniel and inspected and photographed his fields.  The loss adjuster confirmed that weeds had overtaken the older planted fields.  The later planted fields were largely free of weeds.  The loss adjuster noted that the later planted plants had good color and structure, but the plants were small with little fruit production.

304.    On August 18, 2017 McDaniel submitted a second notice of loss claiming that excessive moisture had damaged his crop.  The excessive moisture began on August 14, 2017, and the damage to his crop became apparent on August 18.

305.    On August 27, 2017, the loss adjuster made another inspection of the McDaniels' fields.  The adjuster noted that most of the plants did not exceed 16 inches in height, and the plants were wilting and dying with a few small overripe peppers.  Finally, the loss adjuster noted that the McDaniels' had recently plowed (or cultivated) in areas, but more weeds had begun to form in the rows.

306.    The Agency denied eligibility for NAP coverage for the 2017 green bell pepper crop loss, due to being unable to verify records, transplant dates, inadequate weed control, plant spacing, and failure to follow good farming practices.

307.    The Agency denied McDaniel's second claim stating that his crop was harvested at an earlier date which made him ineligible for NAP coverage.

308. John McDaniel unsuccessfully appealed the Agency's decision to the National Appeals Division. (Case No. 2018S000381)

## COUNT 28

### (Sheila McDaniel)

309. Petitioner Sheila McDaniel incorporates the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

310. Sheila McDaniel transplanted bell peppers on her field on April 21, April 24, and May 21, 2017.

311. Sheila McDaniel filed a notice of loss for her respective field on July 18, 2017, stating that drought and heat caused a loss to the green bell pepper plants.

312. On August 17, an FSA loss adjuster met with John McDaniel, Sheila's husband, and inspected and photographed her field. The loss adjuster confirmed that weeds had overtaken the older planted field. The later planted fields were largely free of weeds. The loss adjuster noted that the later planted plants had good color and structure, but the plants were small with little fruit production.

313. On August 18, 2017 McDaniel submitted a second notice of loss claiming that excessive moisture had damaged her crop. The excessive moisture began on August 14, 2017, and the damage to her crop became apparent on August 18.

314. On August 27, 2017, the loss adjuster made another inspection of the McDaniels' fields. The adjuster noted that most of the plants did not exceed 16 inches in height, and the plants were wilting and dying with a few small overripe peppers. Finally,

the loss adjuster noted that the McDaniels' had recently plowed (or cultivated) in areas, but more weeds had begun to form in the rows.

315.   The Agency denied McDaniel's second claim stating that her crop was harvested at an earlier date which made her ineligible for NAP coverage.

316.   Sheila McDaniel unsuccessfully appealed the Agency's decision to the National Appeals Division.  (Case No. 2018S000403)

## COUNT 29

## (Logan McDaniel)

317.   Petitioner Logan McDaniel incorporates the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

318.   Logan McDaniel transplanted bell peppers on his field on April 24, 2017.

319.   Logan McDaniel filed a notice of loss for his respective field on July 18, 2017, stating that drought and heat caused a loss to the green bell pepper plants.

320.   On August 17, an FSA loss adjuster met with John McDaniel, Logan's father, and inspected and photographed his fields.  The loss adjuster confirmed that weeds had overtaken the older planted fields.  The later planted fields were largely free of weeds.  The loss adjuster noted that the later planted plants had good color and structure, but the plants were small with little fruit production.

321.   On August 18, 2017 McDaniel submitted a second notice of loss claiming that excessive moisture had damaged his crop.  The excessive moisture began on August 14, 2017, and the damage to his crop became apparent on August 18.

322.   On August 27, 2017, the loss adjuster made another inspection of the McDaniels' fields.  The adjuster noted that most of the plants did not exceed 16 inches in height, and the plants were wilting and dying with a few small overripe peppers.  Finally, the loss adjuster noted that the McDaniels' had recently plowed (or cultivated) in areas, but more weeds had begun to form in the rows.

323.   The Agency denied eligibility for NAP coverage for the 2017 green bell pepper crop loss, due to being unable to verify records, transplant dates, inadequate weed control, plant spacing, and failure to follow good farming practices.

324.   The Agency denied McDaniel's second claim stating that his crop was harvested at an earlier date; which makes him ineligible for NAP coverage.

325.   Logan McDaniel unsuccessfully appealed the Agency's decision to the National Appeals Division.  (Case No. 2018S000405)

## COUNT 30

### (Jordan McDaniel)

326.   Petitioner Jordan McDaniel incorporates the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

327.   Jordan McDaniel transplanted the bell peppers on his field on April 22, May 8, May 19, and May 31, 2017.

328.   Jordan McDaniel filed a notice of loss for his respective field on July 18, 2017, stating that drought and heat caused a loss to the green bell pepper plants.

329.    On August 17, an FSA loss adjuster met with John McDaniel, Jordan's father, and inspected and photographed his fields.    The loss adjuster confirmed that weeds had overtaken the older planted fields.    The later planted fields were largely free of weeds.    The loss adjuster noted that the later planted plants had good color and structure, but the plants were small with little fruit production.

330.    On August 18, 2017 McDaniel submitted a second notice of loss claiming that excessive moisture had damaged his crop.    The excessive moisture began on August 14, 2017, and the damage to his crop became apparent on August 18.

331.    On August 27, 2017, the loss adjuster made another inspection of the McDaniels' fields.    The adjuster noted that most of the plants did not exceed 16 inches in height, and the plants were wilting and dying with a few small overripe peppers.    Finally, the loss adjuster noted that the McDaniels' had recently plowed (or cultivated) in areas, but more weeds had begun to form in the rows.

332.    The Agency denied eligibility for NAP coverage for the 2017 green bell pepper crop loss, due to being unable to verify records, transplant dates, inadequate weed control, plant spacing, and failure to follow good farming practices.

333.    The Agency denied McDaniel's second claim stating that his crop was harvested at an earlier date which made him ineligible for NAP coverage.

334.    The McDaniel's unsuccessfully appealed the Agency's decision to the National Appeals Division.    (Case No. 2018S000404)

**COUNT 30**

66

**(Johnnie Womack)**

335.    Petitioner Johnnie Womack incorporates the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

336.    Johnnie Womack farmed fresh green bell peppers in Houston County, Alabama, noticing a loss due to excess moisture/precipitation beginning on June 19, 2017.  The loss became apparent on June 26, 2017, which caused her to abandon her crop.

337.    A certified loss adjuster inspected the acreage on July 11, 2017, and August 17, 2017.    The inspection revealed that the acreage had been abandoned with no cultivation or weed control measures apparent since the July 11, 2017 inspection.

338.    Womack's claim was denied on the assertion of failure to apply good farming practices and adequate care for the covered crop acreage until harvest or until consent was given to abandon the crop.   The denial also asserted the absence of a finalized plan for harvesting and marketing her production.

## COUNT 30

### (Chris Love)

339.    Petitioner Chris Love incorporates the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

340.    Chris Love applied for NAP Coverage for collard greens on February 1, 2017.  Petitioner Love's NAP application was accepted, and Love paid the applicable NAP premium.

341.    On March 29, Love planted collard greens by seed on 91 acres on one field, and 11 acres on other fields.

342.    Before planting, Love did not apply fertilizer or herbicides. He planned to wait to apply chemicals until after the collard green plants emerged.

343.    On April 7, 2017, Love filed a Notice of Loss due to excessive moisture and indicated there would be no harvest.

344.    Twelve days after the Notice of Loss was filed, an FSA loss adjuster inspected and photographed Love's fields. He found plants in one field but did not provide the number or the condition of the plants in his inspection report. The adjuster's photograph showed two small plants. The collard green seeds in another field failed to germinate. Both fields had areas of erosion from rainfall-runoff and areas that retained water for short periods.

345.    In May 2017, the loss adjuster conducted a second inspection and found no collard green production to appraise in either of Love's fields.

346.    The adjuster's final inspection, in August 2017, showed no marketable production in either field. Both fields were overgrown with weeds.

347.    October 2018, FSA disapproved Love's benefits application stating that Love failed to follow good farming practices by not applying pre-plant or post-plant fertilizer or herbicide; the claimed weather event did not impact Love's crop as claimed; Love failed to control weeds; and Love failed to timely harvest.

**COUNT 31**

68

**(Daniel Love)**

348.    Petitioner Daniel Love incorporates the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

349.    Petitioner Love obtained NAP program coverage for his seedless watermelon crop.  In April 2017, Love transplanted watermelon plants on 33.50 acres on three fields.

350.    On May 30, 2017, an FSA loss adjuster conducted a growing season inspection of Love's watermelon crop and took photographs.  The adjuster noted that on two of the three fields there were broadleaf weeds, grass and pigweed observed growing throughout the fields.  He observed that the watermelons on the remaining field displayed signs of damage from deer.  The adjuster did not report observing weeds or grasses growing on the third field.

351.    Love took photographs of his crop on June 22, 2017.  His photographs show images of individual diseased watermelons.

352.    The next day, Love filed a notice of loss, claiming that heat, excessive moisture/precipitation and plant disease affected his entire watermelon crop.  Love claimed that excessive moisture/precipitation, heat, and disease began on June 19, 2017, and that the crop loss first became apparent on June 23, 2017.

353.    Love harvested and sold 37,800 pounds of watermelons on July 1, 2017.

354.    On August 2, 2017, the adjuster inspected and photographed Love's watermelon crop.  The loss adjuster observed that Love had completed the harvest, but

that the fields contained a lot of various sizes of overripe melons. He also observed that most of the melons had become sun scalded while others were rotten and drying up. Additionally, he observed that the melons had been fertilized and irrigated sufficiently to produce a crop of marketable watermelon. He also observed that weeds and grasses were starting to cover the field.

355.    On June 4, 2018, FSA disapproved Love's application for payment. FSA determined that excessive moisture did not cause Love's crop loss. FSA specifically asserted that: (1) the claimed weather event did not impact Love's crop as claimed, (2) Love failed to control weeds, and (3) Love failed to timely notify the Agency that harvest was complete.

## COUNT 32

### (James Love)

356.    Petitioner James Love incorporates the foregoing paragraphs one through fifty-nine (1-59), as if set forth herein verbatim.

357.    On March 30 and March 31, 2017, Petitioner James Love planted his collard green crop by seed on 123 acres on three farms. He did not apply fertilizer or herbicide before planting. He planned to apply chemicals once the plant stands were established.

358.    On April 7, 2017, Love filed a notice of loss, claiming that excessive moisture caused his entire collard green crop loss. He claimed that the excessive moisture began on April 3, 2017 and the loss became apparent on April 7, 2017.

359.    An FSA loss adjuster inspected and photographed Loves fields in April 2017. All fields except for one contained some collard green plants. Both farms had areas of erosion from runoff and areas that retained water for short periods.

360.    In May 2017 the adjuster conducted a second inspection, photographed, and found no collard green production.

361.    The final inspection in August 2017 showed no marketable production. The fields were overgrown with weeds.

362.    In March 2018, Love applied for benefits due to his loss, certifying that he had no production.

363.    In October 2018, FSA disapproved Love's benefits application. After reviewing weather data, FSA asserted that excessive moisture did not cause Love's loss. FSA found that love's loss was due to his failure to follow good farming practices by not applying pre-plant or post-plant fertilizer or herbicide.

## COUNT 33

### (Equitable Relief for All Petitioners)

364.    Petitioners adopt and incorporate herein by reference the foregoing paragraphs one through three hundred and sixty-three (1-363) as if set forth verbatim.

365.    The Farm Bill expresses Congressional intent to encourage farmers to invest

time, money and labor into planting edible crops to insure a steady food supply to American consumers while simultaneously providing relief to farmers whose labor and money are subject to complete loss due to unpredictable effects of devastating weather conditions.

365.    The Non-insured Assurance Program (NAP) authorized by Congress is designed to incentivize farmers to expend labor and money on food crops for which no other insurance is available.

366.    A reviewing Court has the power to set aside agency action, findings and conclusions that deny NAP benefits to a farmer when found to be arbitrary, capricious, in excess of statutory authority, or unsupported by substantial evidence. (5 USC § 706; 7 USC § 6999).

367.    Equitable relief should be granted to farmers such as your Petitioners under two separate situations: (1) when a farmer relies in good faith upon the incorrect actions of an FSA representative (7 CFR § 718.303) or (2) when a farmer who has performed substantial actions required for program eligibility fails to comply completely, but makes a good faith effort to comply fully with the NAP requirements. (7 CFR§ 718.304).

368.    The Agency arbitrarily denied equitable relief under 7 CFR § 718.303 even though substantial evidence revealed that the Petitioners acted in good faith reliance on mistakes on dates inserted in the computer-- generated claim made by FSA representatives.

369. The Agency arbitrarily and capriciously ignored consideration or discussion or evidence for equitable relief under 7 CFR § 718.304 even though substantial evidence revealed that the Petitioners had performed substantial actions required for program eligibility even if they failed to comply completely because they made good faith efforts to fully comply with the NAP requirements.

## PRAYER FOR RELIEF

WHEREFORE your Petitioners request that upon judicial review, or with a hearing de novo, this Court will declare that the Petitioners acted in good faith reliance upon the actions of the Agency, or otherwise made a good faith effort to fully comply with the NAP requirements; to grant equitable relief, to set aside the Agency determination and allow Petitioners to receive NAP benefits for the above-referenced crop years and to otherwise:

a. Find that the Agency decision constitutes prejudicial error and is unwarranted by the facts to the extent that the decision is arbitrary or capricious, in excess of statutory authority, or short of statutory rights, or not supported by substantial evidence;

b. To hold unlawful and set aside the Agency action, findings, and conclusions that denied benefits for the above-referenced crop years;

c. To declare the ruling by the Agency to be contrary and capricious and in excess of statutory jurisdiction or short of statutory right;

d. To grant equitable relief and declare NAP coverage for the above-referenced crop years and to nullify all sanctions imposed for said crop; and,

e. To award such other, further and different relief to which your Petitioners are entitled.

Dustin J. Fowler
ASB-8960-S69F
Buntin, Etheredge & Fowler, LLC
One of the Attorneys for Petitioners
P.O. Box 1193
Dothan, Al 36302
Telephone: (334) 793-3377
Facsimile: (334) 793-7756

Stephen T. Etheredge
ASB-8149-H69S
Buntin, Etheredge & Fowler, LLC
One of the Attorneys for Petitioners
P.O. Box 1193
Dothan, Al 36301
Telephone: (334) 793-337
Facsimile: (334) 793-7756